WILLIAMS *v.* THE STEAM-TUG WM. COX.

*(District Court, S. D. New York. July 24, 1880.)*

1. NEGLIGENCE—PILOT OF TUG—MASTER OF BOAT IN TOW.—It is negligence in both the pilot of a tug and the master of an open loaded boat to attempt to tow such boat across the bay of New York in a gale of wind.

*Mason* v. *The Steam-tug William Murtaugh, ante,* 404, followed.

*E. D. McCarthy,* for libellant.

*F. A. Wilcox,* for claimant.

CHOATE, D. J. This is a libel brought by the owner of the barge Island Home to recover for the loss of the barge, her cargo, and pending freight while on a voyage from Port Johnson, N. J., to Morrisania, N. Y., by way of the bay of New York and the East river, on the twelfth day of February, 1879, in tow of the steam-tug Wm. Cox. The barge was about 95 feet long and 17 feet wide. Her deck was open for about 11 feet in width and 60 feet in length. This opening was without any covering, but had combings about it some 18 inches high. Her carrying capacity was about 230 tons, and she had a cargo of 210 tons of pea coal, unscreened, containing a great deal of dust. She was nearly on an even keel, but loaded slightly by the head, and, when she started, her deck was about two feet and eight inches out of water. The tug had two other boats in tow, which she took on her starboard side. The barge was lashed to her port side. They left Port Johnson at about eight o'clock in the morning, and the barge sunk in the East river, about off Wall street ferry, a little before 11 o'clock. When they left Port Johnson the wind was blowing about 25 miles an hour, and it increased somewhat as the day advanced. The direction of the wind was, as nearly as can be ascertained, west. The barge was in charge of the libellant, who had had a long experience as a boatman in the navigation of the waters about New York. The wind had been blowing hard all the morning, and the danger signals had been displayed at the United States signal service station since 2 o'clock that morning. The tug left Hoboken about

daylight for Port Johnson to take up her tow. The principal charge of negligence against the tug is that she took the barge out at all upon this voyage across the bay in such a wind.

In the recent case of *The Steam-tug Wm. Murtagh*, [*ante,* 404,] it was held to be want of ordinary care on the part of a steamtug to undertake to cross the bay of New York with a deeplyladen canal-boat, known to have no hatch covers, in the wintertime, with the wind blowing 21 miles an hour. In that case it was not contested that the cause of the canal-boat's sinking was her shipping water through her open hatches by reason of the high sea raised on the bay by the violence of the wind. In the present case it is claimed, on behalf of the tug, that this barge did not sink by reason of the water so shipped by her, but, as it is alleged in the answer, "by the neglect of the libellant, the perils of the sea, and the unseaworthiness of the boat." Some attempt has been made to establish the proposition, on the trial, that she sunk from a sudden leak sprung while on the voyage, about 10 or 15 minutes before she went down, and one witness from the tug testifies to seeing a plank sprung off from her starboard side, under her water line, as her stern rose in the water while going down. He is not confirmed by any other witness, although others were standing by and watching her, and I think the evidence is sufficient to establish her general seaworthiness when she started on this voyage.

It is noticeable in this connection that no such sudden springing of a leak, and especially no such specific defect in her planking, is set up in the answer, although if the story of this witness had been credited by the claimants, such defect would be likely to have been set up in the answer. If there were no other adequate cause of the boat's sinking to be found in the evidence, the argument in favor of the cause, assigned by the claimants, would be entitled to much greater weight. But another adequate cause is shown in the state of the wind and sea, and the shipping of water over the open deck of the barge. If entire credit could be given to the testimony of the libellant, she shipped water enough to swamp her long before she sunk. The libellant's testimony on this point is so extravagant, and on this and other points he is so

seriously contradicted, that upon his testimony, uncorroborated, I should hesitate to find any material fact which is disputed. But on this point, that from the time the tow got into the bay, where she was subjected to the full force of the wind and sea, the water broke over her more or less, his testimony is supported by that of several other witnesses, and the fact is so probable in itself that it needs little evidence to establish it, other than the state of wind and weather, which is fully proved.

After coming out of the kills the tow had the wind on the port quarter, and the proof is that the waves came up under the stern and port side of the barge, and the water ran along her deck and was thrown over her combings. It is argued on the part of the tug that this theory is refuted by the evidence that the barge was not observed to have settled in the water at all till she got up to, or nearly up to, Governor's island, and that libellant's pump sucked, whenever he tried it, up to about the time of reaching that place. I think the nature of the cargo, pea coal, containing a good deal of dust, was such that it would hold a large quantity of water, which would not run through to the pumps; and if the flooring of the boat was quite tight, as is testified to by the libellant and not contradicted, a very large part of the water shipped would not reach the pumps. The amount of water required to overload the boat would not exceed 20 tons. It might be considerably less. And I think, upon the testimony, there is no improbability in her having shipped enough water through her open deck to overload her; and there is no sufficient proof of any other cause of her sinking. The captain of the tug first discovered that she was sinking. They were then about up with Governor's island. He thinks she had settled in the water then only about three inches. But on such a point the judgment is very uncertain, especially as the boat was not still, and was in very rough water. The failure to observe that she had been gradually settling from the effect of the water shipped is not, I think, a circumstance of controlling weight. After she was observed to be sinking she went down rapidly, as was to be expected, since she was still on very rough water, and the

lower she got the more water she would take in; and although the captain of the tug did all he could to get her into a dock in the East river, where she could be beached, he was unable to do so before she sunk.

Under the rule laid down in the case of *The Wm. Murtagh,* therefore, both parties are chargeable with want of ordinary care for making the attempt to cross the bay with an open loaded boat in a gale of wind. Slight differences of circumstance will not suffice to distinguish the case, and the loss is immediately attributable to this as the direct and principal cause of the disaster.

It is claimed, however, on the part of the libellant that he should not be charged with half the loss for two reasons: *First,* on the ground that the barge was put on the windward side of the tug, where she was more exposed to the wind and sea than she would have been on the other side; and, *secondly,* because the master of the tug did not, when they got out in the bay, and found how dangerous the passage was, run before the wind, go to the south of Governor's island, and find shelter in Buttermilk channel. The first point is sought to be supported by the testimony of the libellant that he objected to being placed on the port side of the tug; and the second point, by his testimony that when near Oyster island buoy he requested the master of the tug to run before the wind to avoid swamping his barge.

As to both these statements of the libellant, he is, I think, so contradicted that they cannot be taken as proved. As to his request to run before the wind, which he says was twice made and answered by the master of the tug, not only is the proof to the contrary very strong, but the circumstances, and the proved conduct and language of the libellant at other points, render it highly improbable. When the master of the tug, long after this alleged request, hailed him and told him he thought his barge was sinking, he answered that he hoped not. He evidently had not discovered the fact, and at first would not believe it, till he went and looked over the side. Up to that time his pump had brought but little water and had soon sucked; and in answer to the pilot's hail, "How is

she?" he replied several times, "All right." It is quite evident that up to the time they discovered she had settled he had not realized the peril his boat was in; and it is quite improbable that he should have requested a movement of the tow which would be virtually an abandonment of the voyage for the time being, since nothing had happened which excited any special alarm on his part; and, so far as he had observed, his boat was getting along well on her hazardous voyage, the known perils of which he had voluntarily consented to her being subjected to.

When it was found that the boat was sinking he asked the captain to put her in somewhere, and he claims now that she could have been beached in Buttermilk channel; but the testimony shows that the captain of the tug took the course which offered the best chance of saving her, in attempting to run her into some dock on the New York side of the East river, and that she could not, in the state of tide and wind then existing, have been beached at the place indicated by the libellant. It must be taken, therefore, as a fact in the case, that the libellant acquiesced in the taking of the barge upon the voyage as she was taken, and in the prosecution of the voyage as it was prosecuted, up to the time when she was observed to be sinking. Then it was too late to save her from the consequences of that imprudence with which both parties are chargeable.

In my judgment the case cannot be distinguished from that of *The Wm. Murtagh.* The rule laid down in that case is believed to be in the interest of commerce, and of the safety of property, and, if strictly enforced, it will have a strong tendency to break up the very dangerous practice of crossing the bay in rough weather with open boats. If it is understood that the practice involves loss to both parties, in case of disaster traced to this cause, it may make boatmen and tug pilots alike more cautious about taking the risk. It is a risk that endangers life as well as property, since these canalboats are often the homes of the boatmen and their families.

Decree for libellant for half the damages, with costs, and a reference to compute the amount of the damages.